UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

JENI MARIA SYLCOX,                    :

                   Plaintiff,         :    14 Civ. 2161 (PAC)(HBP)

     -against-                        :    REPORT AND
                                           RECOMMENDATION
CAROLYN W. COLVIN, acting             :
Commissioner of Social Security,
                                      :
                   Defendant.
                                      :
----------------------------------X


          PITMAN, United States Magistrate Judge:


          TO THE HONORABLE PAUL A. CROTTY, United States District

Judge,


I.   Introduction


          Plaintiff, Jeni Maria Sylcox, brings this action

pursuant to Section 205(g) of the Social Security Act (the

"Act"), 42 U.S.C. § 405(g), seeking judicial review of a final

decision of the Commissioner of Social Security ("Commissioner")

denying her application for supplemental security income benefits

("SSI").  Plaintiff has moved for judgment on the pleadings under

Rule 12(c) of the Federal Rules of Civil Procedure (Notice of

Motion, dated November 17, 2014 (Docket Item 15)).  The Commis-

sioner has filed a cross-motion also seeking judgment on the

pleadings (Notice of Motion, dated March 12, 2015 (Docket Item 20)).

For the reasons set forth below, I respectfully recommend that plaintiff's motion for judgment on the pleadings be granted to the extent of remanding this matter for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g) and that the Commissioner's motion for judgment on the pleadings be denied.

II.   Facts

A.   Procedural
     Background

Plaintiff filed an application for SSI on July 1, 2011, alleging that she had been disabled since July 13, 2010 (Tr.[1] 126).[2]  The Social Security Administration denied plaintiff's

---

[1]"Tr." refers to the administrative record that the Commissioner filed with her answer, pursuant to 42 U.S.C. § 405(g) (see Notice of Filing of Administrative Record, dated May 2, 2014 (Docket Item 10)).

[2]It appears that plaintiff may have had a protective filing date of June 8, 2011 (see Tr. 14, 31).  A claimant is issued a protective filing date when she files a written statement with the Social Security Administration that indicates an intent to file a claim for benefits.  20 C.F.R. § 416.340.  "If a claimant is given a protective filing date that is earlier than the application date, the availability of social security benefits is calculated from the earlier protective filing date."  Elliott v. Colvin, 13 Civ. 2673 (MKB), 2014 WL 4793452 at *1 n.1 (E.D.N.Y.
(continued...)

application, finding that she was not disabled (Tr. 66-68).
Plaintiff timely requested and was granted a hearing before an
Administrative Law Judge ("ALJ").   ALJ Katherine Edgell conducted
a hearing on July 6, 2012 (Tr. 29-58).   In a decision dated
November 30, 2012, ALJ Edgell determined that plaintiff was not
disabled within the meaning of the Act (Tr. 11-20).   The ALJ's
decision became the final decision of the Commissioner on January
28, 2014 when the Appeals Council denied plaintiff's request for
review (Tr. 1-6).   Plaintiff commenced this action seeking review
of the Commissioner's decision on March 27, 2014 (Complaint
(Docket Item 3)).

       B.   Plaintiff's
            Social Background

            Plaintiff was born in April 1971 (Tr. 143).   She speaks
English (Tr. 146) and holds a college degree (Tr. 34).   Plaintiff
lived with her husband and two children, aged eleven and sixteen
(Tr. 32).   She last worked as a caseworker in 2008 at Child Abuse
Prevention Center, Inc. (Tr. 35-36).   Before that she had worked
as a social worker and as a medical social worker (Tr. 54).

---

[2](...continued)
Sept. 24, 2014), citing Roma v. Astrue, No. 07-CV-1057, 2010 WL
3418165 at *1 n.1 (D. Conn. Mar. 12, 2010) ("[A]ny post-entitle-
ment determinations involving the application filing date would
use the protective filing date.").

    C.   Plaintiff's
         Medical Background[3]

         1.   Treating Physicians

              a.   Various Physicians

     On or about January 28, 2010, plaintiff underwent an

EMG, and Dr. Syed Nasir, M.D., a neurologist, found "electrical

evidence of left C5 cervical radiculopathy[4]" (Tr. 44, 394).

     On February 9, 2010, a report of an MRI of plaintiff's

cervical spine were sent to Dr. Nasir (Tr. 353).  The report

stated:

          There are small posterior broad disc bulges at C3-4
          central to left paracentral and at C4-C5 central.
          These result in some slight narrowing of the cervical
          canal and partially efface the ventral CSP and while
          imminently impinging on the static images the ventral
          cord, they do not deform the cord and no underlying
          cord signal abnormality is seen.  These do not result
          in any appreciable foraminal narrowing

(Tr. 353).

_____

     [3]I recite only those facts relevant to my review.  The
administrative record more fully sets out plaintiff's medical
history (Docket Item 10).

     [4]"Radiculopathy" is a "disease of the nerve roots."
Dorland's Illustrated Medical Dictionary, ("Dorland's") at 1405
(27th ed. 1998).

Later in 2010, plaintiff was treated for two strokes she suffered as a result of a patent foramen ovale[5] that was subsequently closed through surgery (see Tr. 399, 414).

In April 2011, plaintiff saw Dr. Syed I. Moin, M.D., because of pain in her left leg underneath her left knee (Tr. 414). Dr. Moin found plaintiff to have superficial thrombosed varicosity (Tr. 414). Also in April 2011, plaintiff saw Dr. John C. Hordines, Jr., M.D., because of pain in her left leg (Tr. 416). Dr. Hordines opined that plaintiff suffered from worsening superficial thrombophlebitis[6] in her left leg, and he recommended anticoagulation medication and that plaintiff keep her leg elevated (Tr. 416-17). Plaintiff was subsequently seen again by Dr. Moin, who found plaintiff to have swelling and tenderness in the left calf (Tr. 418). He noted that plaintiff was put on IV Heparin and Coumadin[7] and that he would see her again in ten days (Tr. 418).

At around the same time, plaintiff was also seen by Dr. Fauzia Paracha, M.D., who noted plaintiff's history of anxiety,

---

[5]A "patent foramen ovale" is an opening in the heart. See Dorland's at 648-49, 1241.

[6]"Thrombophlebitis" is "inflammation of a vein associated with [blood clot] formation." See Dorland's at 1718.

[7]Heparin and Coumadin are both anticoagulates. See Dorland's at 390, 752, 1850.

5

hypertension, obesity, migraines, and rheumatoid factors[8] with early signs of rheumatoid arthritis (Tr. 420). Dr. Paracha agreed with Dr. Hordines that plaintiff should be put on anti-coagulation medication and should keep her leg elevated (Tr. 421).

On April 29, 2011, Dr. Romeo Mateo, M.D., performed a venous duplex scan for plaintiff and found that she had "occlu-sive superficial venous thrombosis of the greater saphenous vein" (Tr. 321). With respect to plaintiff's left leg, Dr. Mateo found that "[t]here [wa]s no evidence of deep or superficial venous thrombosis in the left lower extremity[, but that] [t]here [wa]s deep venous insufficiency in the common femoral vein" (Tr. 322). He also wrote that, in plaintiff's right leg, "[t]here [wa]s no evidence of deep or superficial venous thrombosis or deep venous insufficiency in the right lower extremity" (Tr. 322).

On June 29, 2011, Dr. Michelle M. Greco, M.D., found that plaintiff had "[n]o deep venous thrombosis" and had "[i]m-proved nonocclusive thrombus within the left greater saphenous vein which appears chronic in nature" (Tr. 472).

---

[8]"Rheumatoid factor" or "RF" is an "antibod[y] . . . found in the serum of about 80 per cent of patients with classical or definite rheumatoid arthritis." Dorland's at 609.

Dr. Robert J. Sommer, M.D., examined plaintiff on November 22, 2011, and wrote the following concerning plaintiff's 2010 heart surgery:

> [Plaintiff] has had a wonderful result from her intervention.  The PFO is closed.  There is no residual right-to-left shunt.  Despite her risk of venous thrombosis, there is no further risk of paradoxical embolization across the patent foramen ovale as it is closed.  I have encouraged her to work with the hematologist to see if there is an identifiable source for her clotting issues.  Otherwise, she should be considered normal from a cardiac perspective.  I do not need to see her regularly going forward

(Tr. 524).

### b.  Dr. Shah

Dr. Nirav Shah, M.D., plaintiff's cardiologist, completed a Medical Source Statement on March 19, 2012 (Tr. 307). At that time, he opined that plaintiff was capable of frequently lifting and carrying up to ten pounds and occasionally lifting and carrying up to twenty pounds (Tr. 307).  Dr. Shah also stated that plaintiff was capable of sitting continuously for up to thirty minutes and could sit for a total of four hours in an eight-hour day, could stand continuously for up to thirty minutes and could stand for a total of two hours in an eight-hour day, and could walk continuously for up to fifteen minutes and could walk for a total of one hour during an eight-hour work day (Tr.

308, 700).  Dr. Shah opined that plaintiff could frequently reach, handle, finger, feel, push and pull with both hands and that she could frequently operate foot controls with both feet (Tr. 309).

Dr. Shah opined that plaintiff was able to climb stairs and ramps frequently and was able to climb ladders and scaffolds, balance, kneel, crouch and crawl occasionally (Tr. 310).  He found that plaintiff could never be exposed to unprotected heights, but that she could occasionally be exposed to moving mechanical parts, humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme cold, extreme heat and vibrations (Tr. 311).  He also found that she could frequently operate a vehicle (Tr. 311).  Dr. Shah wrote that plaintiff was able to perform the following activities:  shopping, traveling without assistance, walking without assistance, walking one block at a reasonable pace on an uneven surface, using public transportation, climbing a few steps at a reasonable pace without use of a hand rail, preparing a simple meal, caring for personal hygiene and sorting, handling or using papers and files (Tr. 312).

In treatment notes from April 27, 2012, Dr. Shah reported "[n]ormal left ventricular size and contractility," "[p]hysiologic valvular heart disease," "[a]neurysmal inter atrial septum w/o shunt," and "[d]iastolic dysfunction" (Tr.

690).   In treatment notes from May 2, 2012, Dr. Shah wrote that he found "[e]vidence of mild peripheral arterial disease in [plaintiff's] right leg," and "[e]vidence of moderate peripheral arterial disease in [plaintiff's] left leg" (Tr. 691).

On June 29, 2012, Dr. Shah wrote that he had been treating plaintiff since October 17, 2010, and that plaintiff had a history of obesity, possible peripheral artery disease and deep vein thrombosis (Tr. 697).

### c.  Dr. Lasky

Dr. H. Paul Lasky, M.D., a rheumatologist, saw plaintiff on September 15, 2010 (Tr. 429).   Dr. Lasky wrote that plaintiff complained of "constant pain in the muscles and joints as well as numbness and tingling on the right side of the face and arms" (Tr. 429).   Dr. Lasky noted that these symptoms had begun a year earlier and that they continued to worsen (Tr. 429). Dr. Lasky also noted that plaintiff had a pinched nerve and had a positive rheumatoid factor (Tr. 429).   Plaintiff also reported poor sleep, forgetfulness, fatigue, numbness, a rash on her hands, muscle weakness, aches and cramps, joint redness and swelling, trouble swallowing, dry eyes, dry mouth, migraines and eye pain (Tr. 429).

Dr. Lasky found that plaintiff's "[r]ange of motion of the peripheral joints was full and without pain.  Fibrositis[9] tender points were mildly to moderately positive at a number of sites but control points were negative" (Tr. 430).  He also opined that "the generalized pain, which predates her strokes, suggests either a cervical radiculopathy for which [he did] not have any evidence, or it represents fibromyalgia[10]" (Tr. 430).

Dr. Lasky's treatment notes are largely illegible (see Tr. 671-74).  It appears that some of them date from 2012 (see Tr. 671, 673), and they appear to contain the words "Flexeril," "RF" and "Fibro" (see Tr. 671, 673-74).

---

[9]"Fibrositis" is "inflammatory hyperplasia of the white fibrous tissue of the body, especially of the muscle sheaths and fascial layers of the locomotor system; it is marked by pain and stiffness."  Dorland's at 630.

[10]"Fibromyalgia" is "[a] syndrome of chronic pain of muscul-oskeletal origin but uncertain cause.  The American College of Rheumatology has established diagnostic criteria that include pain on both sides of the body, both above and below the waist, as well as in an axial distribution (cervical, thoracic, or lumbar spine or anterior chest); additionally there must be point tenderness in at least 11 of 18 specified sites."  Stedman's Medical Dictionary 671 (27th ed. 2000).

2.  <u>Single Decision Maker</u>

W. Shaw, a single decision maker ("SDM"),[11] completed a
Physical Residual Functional Capacity Assessment on September 20,
2011 (Tr. 65).  The record does not disclose what qualifications,
if any, Shaw possessed.  Shaw opined that plaintiff had the
ability to occasionally lift and carry twenty pounds and fre-
quently lift and carry ten pounds (Tr. 61).  Shaw found that
plaintiff was capable of standing and walking with normal breaks
for a total of six hours in an eight-hour day and was also
capable of sitting with normal breaks for a total of six hours in
an eight-hour day (Tr. 61).  Shaw further found that plaintiff
was able to push and pull and could operate hand and foot con-
trols with no restrictions other than those on her ability to
lift and carry (Tr. 61).  Shaw found plaintiff had no limitations
on her ability to manipulate objects or controls (Tr. 62).

Shaw opined that plaintiff was capable of light work
but that she should avoid heights and heavy machinery (Tr. 61).

_____

[11]SDMs are "non-physician disability examiners who 'may make
the initial disability determination in most cases without
requiring the signature of a medical consultant.'"  <u>Hart v.
Astrue</u>, 32 F. Supp. 3d 227, 237 (N.D.N.Y. 2012), <u>quoting</u> <u>Modifi-
cations to the Disability Determination Procedures; Extension of
Testing of Some Disability Redesign Features</u>, 71 Fed. Reg. 45890-
01 (Aug. 10, 2006); <u>accord</u> <u>Leonard v. Colvin</u>, No. 12-CV-526A (F),
2014 WL 1338813 at *4 n.5 (W.D.N.Y. Mar. 31, 2014) (adopting
Report & Recommendation) (internal quotation marks omitted).

Shaw also opined that plaintiff could climb, stoop, kneel, crouch and crawl frequently, balance occasionally, and should never climb ropes, ladders or work on scaffolds (Tr. 62). Shaw wrote:

> Claimant alleges lifting limited to 5 lbs, and walking limited to 5 to 10 minutes requiring a 20 to 30 minute rest. Claimant reports performing personal care, cooks simple meals, light cleaning, claimant travels alone, drives, and does not shop. Based on the medical evidence in file the claimants statements are considered partially credible

(Tr. 63-64).

### 3. Consulting Physicians

#### a. Dr. Puri

Dr. Kautilya Puri, M.D., conducted a neurologic examination of plaintiff on September 7, 2011 (Tr. 502). At that time plaintiff complained of occasional slurring of speech, short-term memory loss, and numbness and tingling of her hands (Tr. 502). Plaintiff attributed these symptoms to residual problems from her strokes (Tr. 502). Dr. Puri found plaintiff to have a normal gait, with mild difficulty walking on heels and toes and mild difficulty tandem walking (Tr. 503). Dr. Puri noted that plaintiff required no help dressing and undressing, getting on and off the exam table, or rising from the chair (Tr. 503). Dr. Puri

12

found plaintiff's hand and finger dexterity intact and grip strength to be 5/5 bilaterally (Tr. 504).

Dr. Puri diagnosed plaintiff with history of deep venous thrombosis, history of cervical neck pain, history of radiculopathy, fibromyalgia, morbid obesity and chronic headaches (Tr. 504). Dr. Puri found plaintiff's prognosis to be fair (Tr. 504). He opined that plaintiff "did not have any objective limitations to communication or fine motor or gross motor activity" (Tr. 505). He also found "no objective limitations to the [plaintiff]'s gait or to her activities of daily living" (Tr. 502). Dr. Puri "recommended that [plaintiff] not carry out strenuous activity or take part in contact activities" (Tr. 505).

b.  Dr. Bodnar

Dr. J. Bodnar, a consulting cardiology internist, completed an evaluation of plaintiff on September 19, 2011 (Tr. 507-08). He wrote that "no residuals of CVA on the CE exam [were] observed - n[orma]l gait and station and dexterity and mentation[.][12] [Plaintiff has the Residual Functional Capacity ("RFC") to] stand[,] sit and walk[] 6/8 h[ou]rs [and] carry 20 lbs - avoid h[eigh]ts and heavy machinery" (Tr. 507).

---

[12]"Mentation" is "mental activity."  Dorland's at 1006.

13

D.  Proceedings
    Before the ALJ

    1.  Plaintiff's Testimony

        Plaintiff testified that she suffered from constant
pain everywhere in her body and was unable to stand or sit for
long periods of time (Tr. 41).  She testified that she was taking
pain medication and muscle relaxers but they did not alleviate
her symptoms (Tr. 42).  She testified that she currently had two
treating physicians, Dr. Lasky, a rheumatologist, and Dr. Shah,[13]
a cardiologist (Tr. 42).  She stated that she had been seeing Dr.
Lasky since 2010 every six to eight weeks and that she saw Dr.
Shaw and had an EKG every six to eight weeks (Tr. 43).  She
stated that her medication made her tired, woozy and dizzy (Tr.
45).  She also testified that she was taking Xanax, but that it
did not relieve all of her symptoms (Tr. 45).

        Plaintiff stated that during a typical day, she would
rise at 6:30 a.m. with her children, prepare breakfast for them
and then would do nothing for the rest of the day (Tr. 45).  She
stated that sometimes her husband helped her shower and dress,
but that if she was feeling good and not in too much pain, she

_____

        [13]The transcript of the hearing incorrectly spells Dr.
Shah's name as "Shaw."

would shower by herself (Tr. 45).  Plaintiff testified that she
spent the day alternating between sitting for a few minutes and
standing for a few minutes (Tr. 46).  She stated that she was
unable to sleep at night and that she was unable to attend any
community events or religious services since her second stroke in
August of 2010 (Tr. 46-47).  Plaintiff testified that the maximum
length of time she could stand varied, ranging from ten minutes
to twenty minutes (Tr. 48).  She stated that she could sit no
more than twenty minutes at a time because of numbing and tin-
gling (Tr. 48).  Plaintiff testified that she could carry a quart
or two of liquid at a time, but she also stated that on some days
she could not hold a coffee cup (Tr. 48-49).  Plaintiff stated
that bending over was difficult, but that she could hold a pencil
(Tr. 49).

In response to questions from her representative,[14]
plaintiff testified that she experienced difficulty holding onto
objects because of numbing and tingling in her fingers (Tr. 49-
50).  She also testified that she was unable to use stairs and
that she did not do household chores (Tr. 50-51).  She stated
that her legs were in "an incredible amount of pain from [her]
veins" and that she could not crawl and never stooped (Tr. 51).

---

[14]Plaintiff had a non-attorney representative at her hear-
ing.

Plaintiff testified that she had difficulty just walking around her house, could not walk more than a block and could not walk at all on an uneven surface (Tr. 51-52).  Plaintiff stated that she did not think she could operate foot controls because everyday she had pain, numbing and tingling in her legs from the knees down (Tr. 52-53).

> 2.   Vocational
>      Expert Testimony

The ALJ heard testimony from Esperanza J. DiStefano, a vocational expert (Tr. 95).  The ALJ asked the vocational expert to assume an individual who could lift and carry up to ten pounds frequently, could lift and carry up to twenty pounds occasion- ally, could sit or stand for up to thirty minutes at a time, could walk for up to fifteen minutes at a time, could stand or walk for up to two hours total, could sit for up to six hours total, could occasionally climb, balance, stoop, kneel, crouch and crawl, could never be around unprotected heights, could never be around pulmonary irritants, dust, odors, cold, heat and vibrations (Tr. 54).  The ALJ asked the vocational expert whether such an individual would be able to perform plaintiff's past work or other work (Tr. 54).  The transcript indicates that the expert

testified that such an individual would not "be able to (INAUDI-BLE) and other work" (Tr. 54).

The ALJ then asked whether a person with "typical [sic] RFC [who] was limited to unskilled tasks because of medication effects" could perform plaintiff's past work or other work (Tr. 54).  The vocational expert responded that such an individual would not be able to perform plaintiff's past relevant work but would be able to perform other jobs (Tr. 55).  The vocational expert testified that such an individual would be able to perform the jobs of order clerk, charge account clerk and surveillance system monitor (Tr. 55).

The ALJ then asked the vocational expert to assume an individual who was able to sit, stand and walk for six hours during an eight-hour day, to carry a maximum of twenty pounds, could perform only unskilled tasks, and could never be around heights or heavy machinery (Tr. 55).  The vocational expert testified that such an individual would be able to perform the work of order clerk, charge account clerk, surveillance system monitor, mail clerk and office helper (Tr. 56).

The ALJ then asked the vocational expert to assume an individual who had "this vocational profile" and could lift up to four pounds total, could alternate every twenty minutes between sitting, standing or walking, and could not work a full eight-

17

hour day (Tr. 56).  The vocational expert testified that such an individual could perform the work of an information clerk, telephone solicitor and order filler (Tr. 56).

III.  <u>Analysis</u>

   A.  Applicable
       <u>Legal Principles</u>

      1.  <u>Standard of Review</u>

      The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is based upon an erroneous legal standard.  42 U.S.C. § 405(g); <u>Selian v. Astrue</u>, 708 F.3d 409, 417 (2d Cir. 2013) (<u>per curiam</u>); <u>Talavera v. Astrue</u>, 697 F.3d 145, 151 (2d Cir. 2012); <u>Burgess v. Astrue</u>, 537 F.3d 117, 127 (2d Cir. 2008).

      The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence.  <u>Tejada v. Apfel</u>, 167 F.3d 770, 773 (2d Cir. 1999); <u>Johnson v. Bowen</u>, 817 F.2d 983, 985 (2d Cir. 1987).  "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision," <u>Ellington v. Astrue</u>, 641 F. Supp. 2d 322, 328

(S.D.N.Y. 2009) (Marrero, D.J.); accord Johnson v. Bowen, supra, 817 F.2d at 986, but "where application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration," Johnson v. Bowen, supra, 817 F.2d at 986.

"'Substantial evidence' is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Talavera v. Astrue, supra, 697 F.3d at 151, quoting Richardson v. Perales, 402 U.S. 389, 401 (1971).  Consequently, "[e]ven where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam), quoting Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982). Thus, "[i]n determining whether the agency's findings were supported by substantial evidence, 'the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" Selian v. Astrue, supra, 708 F.3d at 417, quoting Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam).

19

2.  Determination
of Disability

A claimant is entitled to SSI benefits if she can establish an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see also Barnhart v. Walton, 535 U.S. 212, 217-22 (2002) (both impairment and inability to work must last twelve months).[15]  The impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic techniques," 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D), and it must be "of such severity" that the claimant cannot perform her previous work and "cannot, considering [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  Whether such work is actually available in the area where the claimant

---

[15]The standards that must be met to receive SSI benefits under Title XVI of the Act are the same as the standards that must be met in order to receive disability insurance benefits under Title II of the Act.  Barnhart v. Thomas, 540 U.S. 20, 24 (2003).  Accordingly, cases addressing the latter are equally applicable to cases involving the former.

resides is immaterial.  42 U.S.C. §§ 423(d)(2)(A),
1382c(a)(3)(B).

In making the disability determination, the Commissioner must consider:  "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  Brown v. Apfel, supra, 174 F.3d at 62; DiPalma v. Colvin, 951 F. Supp. 2d 555, 565 (S.D.N.Y. 2013) (Peck, M.J.).

In determining whether a claimant is disabled, the Commissioner must follow the five-step process required by the relevant regulations.  20 C.F.R. § 416.920(a)(4)(i)-(v).  The first step is a determination of whether the claimant is engaged in substantial gainful activity.  20 C.F.R. § 416.920(a)(4)(i). If she is not, the second step requires determining whether the claimant has a "severe medically determinable physical or mental impairment."  20 C.F.R. § 416.920(a)(4)(ii).  If she does, the inquiry at the third step is whether any of these impairments meet one of the listings in Appendix 1 of the regulations.  20 C.F.R. § 416.920(a)(4)(iii).  If the answer to this inquiry is affirmative, the claimant is disabled.  20 C.F.R. § 416.920(a)(4)(iii).

If the claimant does not meet any of the listings in Appendix 1, step four requires an assessment of the claimant's RFC and whether the claimant can still perform her past relevant work given her RFC.  20 C.F.R. § 416.920(a)(4)(iv); see Barnhart v. Thomas, supra, 540 U.S. at 24-25.  If she cannot, then the fifth step requires assessment of whether, given claimant's RFC, she can make an adjustment to other work.  20 C.F.R. § 416.920(a)(4)(v).  If she cannot, she will be found disabled.  20 C.F.R. § 416.920(a)(4)(v); see Selian v. Astrue, supra, 708 F.3d at 417-18; Talavera v. Astrue, supra, 697 F.3d at 151.

RFC is defined in the applicable regulations as "the most [the claimant] can still do despite [her] limitations."  20 C.F.R. § 416.945(a)(1).  To determine RFC, the ALJ "identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b),(c), and (d) of 20 [C.F.R. §§] 404.1545 and 416.945."  Cichocki v. Astrue, 729 F.3d 172, 176 (2d Cir. 2013) (per curiam), quoting SSR 96-8p, 1996 WL 374184 at *1 (July 2, 1996).  The results of this assessment determine the claimant's ability to perform the exertional demands of sustained work and may be categorized as sedentary, light, medium, heavy or very heavy.  20 C.F.R. § 416.967; see Rodriquez v. Apfel, 96 Civ. 8330 (JGK), 1998 WL

22

150981 at *7 n.7 (S.D.N.Y. Mar. 31, 1998) (Koeltl, D.J.).  This ability may then be found to be further limited by nonexertional factors that restrict the claimant's ability to work.  See Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended in part on other grounds on reh'g, 416 F.3d 101 (2d Cir. 2005); Bapp v. Bowen, 802 F.2d 601, 605-06 (2d Cir. 1986).

The claimant bears the initial burden of proving disability with respect to the first four steps.  Selian v. Astrue, supra, 708 F.3d at 418; Burgess v. Astrue, supra, 537 F.3d at 128.  Once the claimant has satisfied this burden, the burden shifts to the Commissioner to prove the final step -- that the claimant's RFC allows the claimant to perform some work other than her past work.  Selian v. Astrue, supra, 708 F.3d at 418; Butts v. Barnhart, supra, 388 F.3d at 383.

In some cases, the Commissioner can rely exclusively on the Medical-Vocational Guidelines ("the Grid") contained in 20 C.F.R. Part 404, Subpart P, Appendix 2 when making the determination at the fifth step.  Gray v. Chater, 903 F. Supp. 293, 297-98 (N.D.N.Y. 1995).  "The Grid takes into account the claimant's RFC in conjunction with the claimant's age, education and work experience.  Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy."  Gray v. Chater, supra,

903 F. Supp. at 298; accord Butts v. Barnhart, supra, 388 F.3d at
383.

The Grid may not be relied upon exclusively in cases
where the claimant has nonexertional limitations that signifi-
cantly restrict her ability to work.  Butts v. Barnhart, supra,
388 F.3d at 383; Bapp v. Bowen, supra, 802 F.2d at 605-06.  When
a claimant suffers from a nonexertional limitation such that she
is "unable to perform the full range of employment indicated by
the [Grid]," Bapp v. Bowen, supra, 802 F.2d at 603, or the Grid
fails "to describe the full extent of a claimant's physical
limitations," Butts v. Barnhart, supra, 388 F.3d at 383, the
Commissioner must introduce the testimony of a vocational expert
in order to prove "that jobs exist in the economy which claimant
can obtain and perform."  Butts v. Barnhart, supra, 388 F.3d at
384 (internal quotation marks and citation omitted); see also
Heckler v. Campbell, 461 U.S. 458, 462 n.5 (1983) ("If an indi-
vidual's capabilities are not described accurately by a rule, the
regulations make clear that the individual's particular limita-
tions must be considered.").

     3.  Treating Physician Rule

When considering the evidence in the record, the ALJ
must give deference to the opinions of a claimant's treating

24

physicians.  Under the regulations' "treating physician rule," a treating physician's opinion will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in . . . [the] record."  20 C.F.R. § 416.927(c)(2)[16]; Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); Diaz v. Shalala, 59 F.3d 307, 313 n.6 (2d Cir. 1995); Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir. 1993).

Before an ALJ can give a treating physician's opinion less than controlling weight, the ALJ must apply various factors to determine the amount of weight the opinion should be given.  These factors include:  (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical support for the treating physician's opinion, (4) the consistency of the opinion with the record as a whole, (5) the physician's level of specialization in the area and (6) other factors that tend to support or contradict the opinion.  20 C.F.R. § 416.927(c)(2)-(6); Schisler v. Sullivan, supra, 3 F.3d at 567; Mitchell v. Astrue, 07 Civ. 285 (JSR), 2009 WL 3096717 at *16 (S.D.N.Y. Sept. 28, 2009)

---

[16]Effective March 26, 2012, Section 416.927(d) was re-codi-fied as Section 416.927(c), but with no substantive changes.  See How We Collect & Consider Evidence of Disability, 77 Fed. Reg. 10,651, 10,657 (Feb. 23, 2012).

(Rakoff, D.J.) (adopting Report & Recommendation); Matovic v. Chater, 94 Civ. 2296 (LMM), 1996 WL 11791 at *4 (S.D.N.Y. Jan. 12, 1996) (McKenna, D.J.).  "[G]ood reasons" must be given for declining to afford a treating physician's opinion controlling weight.  20 C.F.R. § 416.927(c)(2); Schisler v. Sullivan, supra, 3 F.3d at 568; Burris v. Chater, 94 Civ. 8049 (SHS), 1996 WL 148345 at *4 n.3 (S.D.N.Y. Apr. 2, 1996) (Stein, D.J.).

     B.   The ALJ's Decision

          At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since June 8, 2011 (Tr. 16).

          At step two, the ALJ found plaintiff to have several severe impairments, including obesity, "status post cerebro-vascular accidents in July and August 2010 secondary to patent foramen ovale which successfully closed in early 2011," small posterior broad bulges at C3-4 and C4-5 of the cervical spine, possible fibromyalgia, deep venous insufficiency, and superficial thrombosed variscosities in the left lower extremity "which improved with intervention" (Tr. 16).  The ALJ also noted that there was evidence of a C5 cervical radiculopathy (Tr. 16).

          At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or

26

medically equaled the severity of an impairment listed in 20

C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 16).

At step four, the ALJ found that plaintiff had the RFC

to perform light work

> with the following abilities and limitations:  (1) able
> to lift and/or carry 10 pounds frequently and 20 pounds
> occasionally; (2) able to sit, stand and walk 6 hours
> each in an 8-hour workday but must have the opportunity
> to change position at up to 30 minute intervals[;] (3)
> precluded from working at unprotected heights; (4)
> limited to occasional stooping, balancing, kneeling,
> crouching, crawling, work with moving mechanical parts,
> and exposure to dust, fumes, and temperature extremes;
> (5) limited to unskilled work

(Tr. 17).

The ALJ found that plaintiff's "statements concerning

the intensity, persistence and limiting effects of [her] symptoms

[we]re not credible to the extent they [we]re inconsistent with

the above residual functional capacity assessment" (Tr. 17).  In

support of her conclusion, the ALJ noted there were several

inconsistencies between plaintiff's testimony and the medical

evidence.  For example, the ALJ noted that although plaintiff

testified that she is not allowed to drive, her cardiologist had

noted her ability to frequently operate a motor vehicle.  The ALJ

also noted that although plaintiff testified that she experienced

numbness and tingling in her fingers that caused her to drop

items, a consulting neurologist found that she had normal grip

strength and her treating physician found she could handle[17]
frequently.  Third, the ALJ noted that although plaintiff testi-
fied that she experienced pain all over her body, she only sought
treatment for it on one occasion.  Fourth, the ALJ noted that
although plaintiff testified that she could not cook, clean, do
laundry, shop, shower by herself, or attend religious services,
she told the consultative physician in September 2011 that she
cooked, showered and dressed herself, and went out.  Finally, the
ALJ noted that although plaintiff testified that she experienced
fatigue and dizziness as side effects of medication, there was no
documentation of her ever reporting such side effects to her
physicians (Tr. 17-18).

          The ALJ found that the opinions of Dr. Puri, Dr. Shah,
and Shaw, the SDM, were "fairly consistent with each other and
with the record as a whole," and, therefore, she granted them
"some weight" (Tr. 18).  The ALJ wrote that the "most restrictive
[opinion] is [Dr. Shah]'s opinion, [to] which [the ALJ] granted
the greatest weight, with the exception of [Dr. Shah's] opinion
[concerning] the total amount of time that the claimant can
sit/stand/walk in a day" (Tr. 19).  With respect to that portion
of Dr. Shah's opinion, the ALJ found that "[g]iven the rather

----

[17]Neither the ALJ nor Dr. Shah specified what plaintiff is
capable of handling.

unremarkable examinations [in the] record and [the] infrequency with which the claimant has sought treatment for the type of symptoms that she now alleges to cause the greatest limitations," that portion of Dr. Shah's opinion warranted only "little weight," and the ALJ instead adopted the "State agency medical consultant's opinion[18] in that aspect" (Tr. 19).

At step five, the ALJ found that plaintiff could not perform any of her past relevant work (Tr. 19).  The ALJ found that plaintiff could, however, perform jobs that existed in significant numbers in the national economy (Tr. 19).  The ALJ reasoned that if plaintiff could perform the full range of light work, she would be found to be "not disabled" under Grid Rule 202.21 (Tr. 20).  The ALJ found, however, that plaintiff's ability to perform substantially all of the requirements of that level of work was restricted by further limitations (Tr. 20). The ALJ wrote that she was, therefore, relying on the vocational expert's testimony that an individual with plaintiff's age, education, work experience and RFC could perform the requirements of order clerk, accounts clerk and surveillance systems monitor

---

[18]While the ALJ refers to a state agency medical consultant, the "opinion" which she cites is actually the assessment done by the SDM.  As noted above, there is nothing in the record suggest-ing that the SDM has any medical training.

(Tr. 20).  Thus, the ALJ found that plaintiff was not disabled
(Tr. 20).

      C.  Analysis of the
         ALJ's Decision

      Plaintiff argues that remand is required because the
ALJ erred by (1) failing to give controlling weight to the
opinions and diagnoses of plaintiff's treating physicians, (2)
improperly assessing plaintiff's pain and other impairments, (3)
improperly assessing plaintiff's credibility, and (4) improperly
relying on vocational expert testimony.[19]

      1.  Treating Physicians

        a.  Dr. Shah

      Plaintiff first argues that the ALJ erred by failing to
afford controlling weight to Dr. Shah's opinion with respect to

---

      [19]In her Reply brief, plaintiff raises various other argu-
ments for the first time (Plaintiff's Reply Memorandum in Support
of a Motion for Judgment on the Pleadings Under Rule 12(c)
Fed.R.Civ.P. and in Opposition to Defendant's Cross-Motion, dated
April 9, 2015 (Docket Item 22) at 1, 2, 5, 7-10).  "This Circuit
has made clear it disfavors new issues being raised in reply
papers."  Rowley v. City of New York, 00 Civ. 1793 (DAB), 2005 WL
2429514 at *5 (S.D.N.Y. Sept. 30, 2005), citing Keefe v. Shalala,
71 F.3d 1060, 1066 n.2 (2d Cir. 1995); accord Magnoni v. Smith &
Laquercia, 483 F. App'x 613, 616 (2d Cir. 2012) (summary order).
Accordingly, I do not consider these issues.

plaintiff's ability to sit, stand and walk (Plaintiff's Memoran-
dum in Support of a Motion for Judgment on the Pleadings Under
Rule 12(c) Fed.R.Civ.P., dated November 17, 2014 (Docket Item 16)
("Pl.'s Mem.") at 16).  Plaintiff contends that Dr. Shah's
opinion was consistent with the medical evidence and that the ALJ
erred by failing to provide good reasons for rejecting Dr. Shah's
opinion (Pl.'s Mem. at 16).  Plaintiff also argues that the ALJ
erred because the opinion that the ALJ referred to as the State
Medical Consultant's opinion, which the ALJ adopted with respect
to plaintiff's ability to sit, stand and walk, was not an opinion
from a medical source (Pl.'s Mem. at 17).

> With respect to Dr. Shah's opinion concerning plain-
tiff's ability to sit, stand and walk, the ALJ wrote:

> > The most restrictive [opinion] is the treating physi-
> > cian's opinion [of Dr. Shah], which has been granted
> > the greatest weight, with the exception of the physi-
> > cian's opinion that the total amount of time that the
> > claimant can sit/stand/walk in a day.  Given the rather
> > unremarkable examinations of record and infrequency
> > with which the claimant has sought treatment for the
> > type of symptoms that she now alleges to cause the
> > greatest limitations, the undersigned grants that
> > portion little weight and instead adopts the State
> > agency medical consultant's opinion in that aspect

(Tr. 18-19).

> I cannot assess plaintiff's argument that Dr. Shah's
opinion should be granted controlling weight at this time be-
cause, as discussed later in this Report, the record in this case

31

needs to be developed further with respect to plaintiff's treat-
ment and treating physicians.  See 20 C.F.R. § 416.927(c)(2);
Shaw v. Chater, supra, 221 F.3d at 134; Downs v. Colvin, 14 Civ.
7147 (JLC), 2015 WL 4481088 at *12 (S.D.N.Y. July 22, 2015)
(Cott, M.J.) ("Even if the ALJ's decision might ultimately be
supported by substantial evidence, the Court cannot reach this
conclusion where the decision was based on an incomplete re-
cord.").

    I note also that the ALJ stated that she adopted the
opinion of the "State agency medical consultant" instead of Dr.
Shah's; however, as noted above, the opinion that she cited to
was not that of a medical consultant but rather was that of an
SDM.[20]  An SDM assessment is not a medical opinion for the pur-
poses of appeals.  Alberalla v. Colvin, No. 13-CV-881-RJA, 2014
WL 4199689 at *10 (W.D.N.Y. Aug. 22, 2014) (Report & Recommenda-
tion) ("SDM-completed forms are not opinion evidence at the
appeals level." (internal quotation marks omitted)), adopted at,

---

[20]The Commissioner appears to argue that the ALJ relied on
Dr. Bodnar's opinion in determining the plaintiff's RFC (Memoran-
dum of Law in Opposition to Plaintiff's Motion for Judgment on
the Pleadings and in Support of the Acting Commissioner's Cross
Motion for Judgment on the Pleadings, dated March 12, 2015
(Docket Item 21) at 18).  The Commissioner's argument is contra-
dicted by the ALJ's opinion, which cites Shaw's assessment when
discussing the opinion of a medical consultant (Tr. 18 (citing
Exhibit 2A)).

2014 WL 5361950 (W.D.N.Y. Oct. 21, 2014); <u>Sears v. Astrue</u>, 2:11-
CV-138, 2012 WL 1758843 at *6 (D. Vt. May 15, 2012) (Because SDMs
"[are] not . . . medical professional[s,] . . . courts have found
that an RFC assessment from such an individual is entitled to no
weight as a medical opinion.").

      "While 'any error [an] ALJ may have made in weighing
the opinion of [an] SDM [ ] as if he was a medical consultant is
harmless' so long as 'the ALJ did not heavily rely on this
opinion in denying benefits[,]'" <u>Box v. Colvin</u>, 3 F. Supp. 3d 27,
46 (E.D.N.Y. 2014), <u>quoting</u> <u>Sears v. Astrue</u>, <u>supra</u>, 2012 WL
1758843 at *6, here the ALJ gave the SDM "opinion" greater weight
than the opinion of plaintiff's treating physician and relied on
it in determining plaintiff's functional ability to sit, stand
and walk.  Such reliance was not harmless.

      Accordingly, remand is required for the ALJ to reassess
the evidence, keeping in mind that the SDM assessment is not a
medical opinion.[21]

---

     [21]Plaintiff appears to offer several additional arguments in
this section of her brief that do not clearly relate to her
argument that the ALJ gave insufficient weight to Dr. Shah's
opinion.

     Plaintiff argues that the ALJ never clarified the period of
time that Dr. Shah's opinion covered (Pl.'s Mem. at 18).  She
does not explain how that relates to the ALJ not according Dr.
Shah's opinion controlling weight, and it is not apparent from
                           (continued...)

_____

(...continued)
the record what plaintiff is referring to.

     Plaintiff further argues that the ALJ erred by assuming that
Dr. Shah considered pain in his evaluation of plaintiff's func-
tional abilities (Pl.'s Mem. at 17).  Plaintiff does not identify
the portion of the ALJ's opinion where she allegedly made that
assumption.  She cites Mimms v. Heckler, 750 F.2d 180 (2d Cir.
1984), in which an ALJ rejected the plaintiff's assertions of
pain on the basis of an explicit assumption that her treating
physician considered it.  The ALJ did not use such reasoning
here.  It is also not clear how this relates to plaintiff's
argument that the ALJ gave insufficient weight to Dr. Shah's
opinion.

     Plaintiff also argues that the ALJ failed to develop evi-
dence "about matters which concerned the Court in Rugless v.
Commissioner of Social Sec.[,] 548 [F. App'x] 698 (2d Cir. 2013)
(Court required explanation about ALJ's failure to discuss
Rugless' being off task, and missing unscheduled work days)"
(Pl.'s Mem. at 17).  Plaintiff does not explain how this relates
to her argument that the ALJ should have fully credited Dr.
Shah's opinion.  To the extent that this is an argument regarding
plaintiff's ability to concentrate, I address this at pages 39-
40, below.

     Plaintiff contends that Dr. Shah's opinion with respect to
plaintiff's use of her hands is inconsistent with MRI evidence
and argues that Dr. Shah never treated plaintiff for pain in her
hands (Pl.'s Mem. at 17).  It is not clear how this relates to
plaintiff's argument that the ALJ gave insufficient weight to Dr.
Shah's opinion.

     Lastly, plaintiff argues that the ALJ "overlooked the fact
that [plaintiff] had two strokes beforehand, and suffered head-
aches, and slurred speech when she had them (Pl.'s Mem. at 18).
It is clear that the ALJ considered the fact that plaintiff had
two strokes -- she explicitly mentions it (see Tr. 16).  In
addition, she cites the fact that plaintiff subsequently had
successful cardiac surgery (see Tr. 18).  Again, it is not clear
how this argument relates to Dr. Shah's opinion.

34

b.  <u>Dr. Lasky</u>

Plaintiff next argues that the ALJ erred by rejecting Dr. Lasky's diagnosis of fibromyalgia (Pl.'s Mem. at 18). Plaintiff argues in another section of her brief that "the ALJ failed to develop evidence from Dr. Lasky as to whether or not he made the diagnosis of Fibromyalgia" (Pl.'s Mem. at 20).  In addition, plaintiff contends that the ALJ erred (1) by failing to clarify whether Dr. Lasky treated plaintiff for pain, (2) by failing to ascertain whether plaintiff's pain was due to multiple conditions, and (3) by failing to seek an opinion from Dr. Lasky about the basis for his diagnosis and an opinion concerning plaintiff's RFC (Pl.'s Mem. at 18).  In essence, plaintiff is claiming that the ALJ failed to develop the record with respect to Dr. Lasky.

"It is the rule in [the Second] [C]ircuit that 'the ALJ, unlike a judge in a trial, must [her]self affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding.'"  <u>Pratts v. Chater</u>, 94 F.3d 34, 37 (2d Cir. 1996) (third alteration in original), <u>quoting</u> <u>Echevarria v. Sec'y of Health & Human Servs.</u>, 685 F.2d 751, 755 (2d Cir. 1982).  Where, as here, a claimant appeared without

35

counsel,[22] this obligation is heightened.  See Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990), citing Echevarria v. Sec'y of Health & Human Servs., supra, 685 F.2d at 755; Jones v. Apfel, 66 F. Supp. 2d 518, 523 (S.D.N.Y. 1999) (Pauley, D.J.) (adopting Report & Recommendation).

The ALJ is required "affirmatively to seek out additional evidence only where there are 'obvious gaps' in the administrative record." Eusepi v. Colvin, 595 F. App'x 7, 9 (2d Cir. 2014) (summary order), quoting Rosa v. Callahan, 168 F.3d 72, 79, 79 n.5 (2d Cir. 1999); see also 20 C.F.R. § 416.912(d) ("Before we make a determination that you are not disabled, we will develop your complete medical history . . . .").[23]

────────────

[22]While plaintiff is currently represented by counsel, she appeared with a non-attorney representative at her hearing (see Tr. 123) and appears to have been proceeding pro se for some of her application process (see Tr. 8-9).

[23]On March 26, 2012, the regulations were modified to delete language which imposed a duty to recontact a treating physician when "the report from [a claimant's] medical source contain[ed] a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 416.912(e)(1) (2010); see How We Collect & Consider Evidence of Disability, 77 Fed. Reg. 10,651, 10,651 (Feb. 23, 2012) (codified at 20 C.F.R. pts. 404, 416). The amended regulations apply here. See Lowry v. Astrue, 474 F. App'x 801, 804 n.2 (2d Cir. 2012) (summary order) (applying the version of the regulations that were current at the time the ALJ adjudicated the plaintiff's claim).

"[T]he current amended regulations . . . give an ALJ more
(continued...)

36

"[T]o the extent that [the] record is unclear, the Commissioner has an affirmative duty to 'fill any clear gaps in the administrative record' before rejecting a treating physician's diagnosis." <u>Selian</u>, 708 F.3d at 420 (quoting <u>Burgess</u>, 537 F.3d at 129); <u>see</u> <u>also</u> <u>Schaal v. Apfel</u>, 134 F.3d 496, 505 (2d Cir. 1998) (discussing ALJ's duty to seek additional information from treating physician <u>sua</u> <u>sponte</u> if clinical findings are inadequate).  As a result, "the 'treating physician rule' is inextricably linked to the duty to develop the record. . . ."  <u>Lacava v. Astrue</u>, No. 11-CV-7727 (WHP)(SN), 2012 WL 6621731, at *13 (S.D.N.Y. Nov. 27, 2012) ("In this Circuit, the [treating physician] rule is robust.") <u>adopted</u>, 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012).

Because "[t]he expert opinions of a treating physician as to the existence of a disability are binding on the fact finder, it is not sufficient for the ALJ simply to secure raw data from the treating physician." <u>Jackson v. Colvin</u>, No. 13-CV-5655 (AJN)(SN), 2014 WL 4695080, at *19 (S.D.N.Y. Sept. 3, 2014) (quoting <u>Peed v. Sullivan</u>, 778 F. Supp. 1241, 1246 (E.D.N.Y. 1991)).  Therefore, "the ALJ must 'make every reasonable effort to obtain not merely the medical records of the treating physician but also a report that sets forth the opinion of that treating physician as to the existence, the nature, and the severity of the claimed disability.'" <u>Molina v. Barnhart</u>, No. 04-

---

[23](...continued)
discretion to 'determine the best way to resolve the inconsistency or insufficiency' based on the facts of the case . . . ."  <u>Rolon v. Comm'r of Soc. Sec.</u>, 994 F. Supp. 2d 496, 505 (S.D.N.Y. 2014) (Nathan, D.J.), <u>quoting</u> 20 C.F.R. §§ 404.1520b(c)(1), 416.920b(c)(1) (2013).  However, the regulations continue to "contemplate the ALJ recontacting treating physicians when 'the additional information needed is directly related to that source's medical opinion.'" <u>Jimenez v. Astrue</u>, 12 Civ. 3477 (GWG), 2013 WL 4400533 at *11 (S.D.N.Y. Aug. 14, 2013) (Gorenstein, M.J.), <u>quoting</u> <u>How We Collect and Consider Evidence of Disability</u>, <u>supra</u>, 77 Fed. Reg. at 10,652; <u>accord</u> <u>Cancel v. Colvin</u>, 14 Civ. 2034 (PKC), 2015 WL 865479 at *4 (S.D.N.Y. Mar. 2, 2015) (Castel, D.J.).

CV-3201 (GEL), 2005 WL 2035959, at *6 (S.D.N.Y. Aug. 17, 2005) (quoting <u>Peed</u>, 778 F. Supp. at 1246).

<u>Downes v. Colvin</u>, <u>supra</u>, 2015 WL 4481088 at *10-*11.

The dearth of records concerning Dr. Lasky's treatment of plaintiff is such a gap.  The ALJ should have developed the record with respect to Dr. Lasky because he appears to have treated plaintiff regularly.  Plaintiff identified Dr. Lasky as a current treating physician at her hearing in July 2012 and in a list of treating physicians dated May 9, 2012 (Tr. 282).  Despite evidence in the record that suggested that plaintiff might be at the early stages of rheumatoid arthritis and might have fibro-myalgia (<u>see</u> Tr. 671, 673-74, 677), the ALJ failed to obtain further evidence concerning those conditions.  The treatment notes in the record from Dr. Lasky are illegible and therefore not particularly probative.  The ALJ should have recontacted Dr. Lasky for clarification of his notes, to determine whether he had diagnosed plaintiff with fibromyalgia, to determine whether he had any further documentation of plaintiff's treatment and for his opinion on plaintiff's functional abilities.

Accordingly, remand is required for further development of the record with respect to Dr. Lasky.

    2.  Pain and Plaintiff's
       Impairments[24]

      Plaintiff next argues that the ALJ "failed to combine the effects of pain and all of [plaintiff's] impairments" (Pl.'s Mem. at 19).  Beyond a conclusory statement that the ALJ failed to "combine the effects of pain and all of [plaintiff]'s impairments, and then a list of plaintiff's impairments (Pl.'s Mem. at 20), plaintiff does not meaningfully explain what the ALJ failed to consider.  In this section of her brief, plaintiff again raises the ALJ's failure to develop the record with respect to Dr. Lasky and plaintiff's possible diagnosis of fibromyalgia (Pl.'s Mem. at 20).  She also argues that "[t]he pain and its attendant effect on [plaintiff's] ability to maintain concentration wasn't harmless [sic]" (Pl.'s Mem. at 21).  However, there does not appear to be any evidence that plaintiff had an impaired ability to concentrate as a result of pain, and indeed plaintiff

---

    [24]Plaintiff's brief contains a section entitled "The ALJ failed to combine the effects of pain and all of Mrs. Sylcox['s] impairments" and a section entitled "The ALJ failed to follow proper legal standards in evaluating Mrs. Sylcox'[s] RFC" (Pl.'s Mem. at 19, 22).  Because the substance of the sections appears to be the same, I address them together.

admits that the record is devoid of evidence of a moderate mental impairment (Pl.'s Mem. at 23).[25]

Plaintiff also argues that "[t]he ALJ's requirement that [plaintiff] [sic] the effects of obesity is belied by the ALJ's obligation to develop evidence" (Pl.'s Mem. at 21).  It is not clear what plaintiff means by this argument, and in any event, it appears that the ALJ did consider plaintiff's obesity (Tr. 18).  In addition, plaintiff has not identified any limita-tions resulting from her obesity.  See Proper v. Astrue, No. 6:10-CV-1221 (GTS), 2012 WL 1085812 at *6 (N.D.N.Y. Feb. 28, 2012) (Report & Recommendation), adopted at, 2012 WL 1085810 (N.D.N.Y. Mar. 30, 2012) ("The mere presence of a disease or impairment alone, of course, is insufficient to establish dis-ability.").

On remand, the ALJ will of course have to reassess plaintiff's RFC in light of any new evidence from Dr. Lasky.

---

[25]Plaintiff did testify that she suffers from anxiety, but she does not appear to have sought psychological treatment for that condition (see Tr. 282 (plaintiff's listing of her physi-cians)).  She also lists a prescription for Alprazolam that was first prescribed for her in 2012 (Tr. 285).  She states that "all [d]octors at one time or another" prescribed it for her and that it was prescribed "for anxiety," although it was "originally given for heart" (Tr. 285).

### 3. Credibility Assessment

Plaintiff argues that the ALJ erred in rejecting her testimony on the basis of its inconsistency with "the 'above residual functional capacity'" (Pl.'s Mem. at 21). Plaintiff also argues that the ALJ erred in rejecting her testimony regarding pain based on the ALJ's misapprehension that plaintiff saw Dr. Lasky only once, when in fact plaintiff had seen Dr. Lasky at least four times (Pl.'s Mem. at 22). Plaintiff also contends that the ALJ erred in using testimony from different time periods to discount plaintiff's testimony about performing activities of daily living (Pl.'s Mem. at 22).

When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, 20 C.F.R. § 416.929; see McLaughlin v. Sec'y of Health, Educ. & Welfare, 612 F.2d 701, 704-05 (2d Cir. 1980), but is not required to accept the claimant's subjective complaints without question; she may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record. Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).

> The regulations provide a two-step process for evaluating a claimant's assertions of pain and other limitations. At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. 20 C.F.R. § 404.1529(b).

> That requirement stems from the fact that subjective
> assertions of pain alone cannot ground a finding of
> disability.  20 C.F.R. § 404.1529(a).  If the claimant
> does suffer from such an impairment, at the second
> step, the ALJ must consider "the extent to which [the
> claimant's] symptoms can reasonably be accepted as
> consistent with the objective medical evidence and
> other evidence" of record.  Id.  The ALJ must consider
> "[s]tatements [the claimant] or others make about [her]
> impairment(s), [her] restrictions, [her] daily activi-
> ties, [her] efforts to work, or any other relevant
> statements [she] make[s] to medical sources during the
> course of examination or treatment, or to [the agency]
> during interviews, on applications, in letters, and in
> testimony in [its] administrative proceedings."  20
> C.F.R. § 404.1512(b)(3); see also 20 C.F.R. §
> 404.1529(a); S.S.R. 96-7p.

Genier v. Astrue, supra, 606 F.3d at 49.  The ALJ must explain

her decision to reject plaintiff's statements "'with sufficient

specificity to enable the [reviewing] Court to decide whether

there are legitimate reasons for the ALJ's disbelief' and whether

h[er] decision is supported by substantial evidence."  Calzada v.

Astrue, supra, 753 F. Supp. 2d at 280 (alteration in original),

quoting Fox v. Astrue, 6:05-CV-1599 (NAM)(DRH), 2008 WL 828078 at

*12 (N.D.N.Y. Mar. 26, 2008).

     It is legal error for the ALJ to make "a determination

with respect to plaintiff's overall RFC and then use[] that RFC

to discount plaintiff's non-conforming allegations and resulting

limitations."  Norman v. Astrue, 912 F. Supp. 2d 33, 86 (S.D.N.Y.

2012) (Carter, D.J.) (adopting Report & Recommendation).  How-

ever, this boilerplate language does not automatically require

remand if the ALJ has otherwise adequately engaged in a credibility analysis.  See Filus v. Astrue, 694 F.3d 863, 868 (7th Cir. 2012) (holding that inclusion of boilerplate language stating claimant's statements are not credible to the extent they are inconsistent with the "above" RFC, may be harmless "[i]f the ALJ has otherwise explained his conclusion adequately," offering reasons grounded in the evidence); Butler v. Colvin, 14 Civ. 2325 (SN), 2015 WL 3606278 at *19 (S.D.N.Y. June 8, 2015) (Netburn, M.J.); Angolano v. Colvin, No. 2:13-CV-321, 2015 WL 1778066 at *10 (D. Vt. Apr. 20, 2015).  The ALJ engaged in a credibility analysis here, citing numerous specific inconsistencies between plaintiff's testimony and the medical record (see Tr. 18).  Thus, remand is not required on the basis of the boilerplate language alone.

Nevertheless, the ALJ should reassess plaintiff's credibility on remand because her credibility analysis contains factual inaccuracies.  As plaintiff points out, the ALJ discounted plaintiff's complaints of pain because she only saw Dr. Lasky a single time in 2010, when in fact the record contains treatment notes from Dr. Lasky dated 2012.  Plaintiff also contends that the ALJ incorrectly discounted plaintiff's testimony at her hearing in July 2012 that she could not engage in most daily activities on the basis of reports from September 2011

43

that she could engage in those activities.  Plaintiff contends
that this was improper because the reports were from a substan-
tially earlier time period.  I do not find this to be necessarily
improper -- if plaintiff's condition stayed the same or improved
throughout that time period, the ALJ could reasonably find that
her earlier statements contradicted her later testimony; however,
if plaintiff's condition worsened, then it would be improper for
the ALJ to discount plaintiff's testimony based on statements
made when she was in a less severe condition.  The development of
the record with respect to Dr. Lasky should help shed some light
on plaintiff's condition in 2012.  As discussed above, the ALJ
needs to develop the medical record further, and therefore a
reassessment of plaintiff's credibility will be required in light
of any evidence added to the record.

Accordingly, remand is required for the ALJ to reassess
plaintiff's credibility.

### 4.  Vocational Expert Testimony

Finally, plaintiff argues that the ALJ could not rely
on vocational expert testimony at step five of the disability
evaluation process because none of the RFCs which the vocational
expert was asked to assume were supported by substantial evi-

44

dence, nor did they otherwise account for plaintiff's limitations (Pl.'s Mem. at 24).

"An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as the facts of the hypothetical are based on substantial evidence and accurately reflect the limitations and capabilities of the claimant involved." Calabrese v. Astrue, 358 F. App'x 274, 276 (2d Cir. 2009) (summary order) (citations omitted), citing Dumas v. Schweiker, 712 F.2d 1545, 1553-54 (2d Cir. 1983) and Aubeuf v. Schweiker, 649 F.2d 107, 114 (2d Cir. 1981) ("[A] vocational expert's testimony is only useful if it addresses whether the particular claimant, with his limitations and capabilities, can realistically perform a particular job."); Lugo v. Chater, 932 F. Supp. 497, 504 (S.D.N.Y. 1996) (Sotomayor, D.J.) ("Proper use of vocational testimony presupposes both an accurate assessment of the claimant's physical and vocational capabilities, and a consistent use of that profile by the vocational expert in determining which jobs the claimant may still perform.").

As discussed above, the ALJ erred in his determination of plaintiff's RFC, such that plaintiff's RFC was not supported by substantial evidence.  Given the need for further development of the record here and reassessment of plaintiff's credibility and physician opinions, I cannot determine at this time whether

the ALJ elicited relevant testimony from the vocational expert. I further note that the ALJ may need to obtain further vocational expert testimony if she determines that plaintiff has an RFC that is not reflected in the hypotheticals previously asked to the vocational expert.[26]

IV.   Conclusion

Accordingly, for all the foregoing reasons, I respectfully recommend that plaintiff's motion for judgment on the pleadings be granted to the extent of remand and that the Commissioner's cross-motion be denied.

---

[26]I also note that the vocational expert testimony in the record is not very clear (see Tr. 54-57).  On page 24 of the transcript of the hearing, the ALJ asks the vocational expert a question about "that typical RFC" with an additional limitation of unskilled work (Tr. 54).  It is not clear what the "typical" RFC is, and if it simply referred to the first hypothetical RFC that the ALJ posed, it is not clear how an individual with the first hypothetical RFC could perform no work in the economy, but an individual with that hypothetical RFC plus an additional limitation of unskilled work could perform work in the economy (see Tr. 54-55).  On page 25 and 26 of the transcript of the hearing, the ALJ poses questions to the vocational expert about "this vocational profile," with additional limitations (Tr. 55-56).  It is not clear what "this vocational profile" is.  If relied on after remand, this testimony should be clarified.

V.   <u>Objections</u>

        Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report to file written objections.  <u>See also</u> Fed.R.Civ.P. 6(a).  Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the Chambers of the Honorable Paul A. Crotty, United States District Judge, 500 Pearl Street, Room 1350, and to the Chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007.  Any requests for an extension of time for filing objections must be directed to Judge Crotty.  FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS **WILL** RESULT IN A WAIVER OF OBJECTIONS AND **WILL** PRECLUDE APPELLATE REVIEW. <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985); <u>United States v. Male Juvenile</u>, 121 F.3d 34, 38 (2d Cir. 1997); <u>IUE AFL-CIO Pension Fund v. Herrmann</u>, 9 F.3d 1049, 1054 (2d Cir. 1993); <u>Frank v. Johnson</u>, 968 F.2d 298, 300 (2d Cir. 1992); <u>Wesolek v. Canadair</u>

Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714

F.2d 234, 237-38 (2d Cir. 1983) (per curiam).

Dated:   New York, New York
         August 13, 2015

                              Respectfully submitted,


                              _____
                              HENRY PITMAN
                              United States Magistrate Judge

Copies transmitted to:

Carolyn A. Kubitschek, Esq.
Lansner & Kubitschek
325 Broadway, Suite 201
New York, New York 10007

Irwin M. Portnoy, Esq.
Irwin M. Portnoy & Associates, P.C.
542 Union Avenue
New Windsor, New York 12553

Susan C. Branagan, Esq.
United States Attorney Office
Southern District of New York
86 Chambers Street
New York, New York 10007